18 N.Y.2d 41 (1966)
Diocese of Buffalo, Appellant-Respondent,
v.
State of New York et al., Respondents-Appellants. (Claim No. 36242.)
Diocese of Buffalo, Appellant-Respondent,
v.
State of New York, Respondent-Appellant. (Claim No. 39672.)
Court of Appeals of the State of New York.
Argued March 23, 1966
Decided June 9, 1966.
Kevin Kennedy for appellant-respondent.
Louis J. Lefkowitz, Attorney-General (Jean M. Coon and Ruth Kessler Toch of counsel), for State of New York, respondent-appellant. Thomas F. Moore, Jr., Scott B. Lilly and Lewis R. Bennett for Power Authority of State of New York, respondent-appellant.
Chief Judge DESMOND and Judges FULD, SCILEPPI and KEATING concur with Judge BURKE; Judge VAN VOORHIS dissents in an opinion in which Judge BERGAN concurs.
*44 BURKE, J.
These proceedings involve the valuation of cemetery property.
The claimant has appealed from an order of the Appellate Division reducing the award of the Court of Claims from $14,557 to $10,752 for the appropriation of .652 acres of land and affirming an award of $5,000 for consequential damage resulting from the condemnation of the remaining frontage on the only direct access road to the cemetery. The case of the State of New York is similar in all respects to the companion case involving .942 acres appropriated for use of the Power Authority, except the State appropriation took place two years later, was of land to the north of the original taking, and deprived claimant of its remaining frontage on Military Road  the only direct access road to the cemetery. In the case of the Power Authority the Appellate Division reduced the award from $19,898 to $14,269.
In their cross appeals, the claimant seeks a reinstatement of the judgments of the Court of Claims, while the respondents ask *45 for additional reductions in the awards. The Appellate Division in reducing the awards held that an Inwood factor reflecting a 6% rate of return should have been employed rather than one reflecting a 4% rate of return which the Court of Claims employed.
The court below has affirmed the findings of fact of the Court of Claims: (1) that the highest and best available use was for cemetery purposes; (2) that, since the development of the appropriated land was imminent at the time of the taking, graves would be sold in the appropriated area throughout the entire period of years needed to sell the entire unsold number of grave sites; and (3) that the basic figures which were found by the Court of Claims based upon past experience of the cemetery were supported by the evidence in the record.
The respondents make four contentions: (I) that the highest and best available use be considered use for residential purposes; (II) that, assuming it should be valued for cemetery purposes, the Court of Claims erred in finding that the period in which the appropriated land would be sold was during a period of 55 and 61 years rather than at a time after the end of each period and also erred in the method of computing net income from the sales of graves; (III) that, assuming the court below was correct in holding the best available use to be for cemetery purposes, it nevertheless erred in employing an Inwood factor reflecting a 6% rate of return rather than one based on a higher rate of return; and (IV) that claimant is not entitled to consequential damage for complete loss of access to Military Road.
Since the arguments of neither the claimant nor the respondents are persuasive we agree with the determination of the Appellate Division.
Before we deal with the question of whether the Appellate Division had a logical basis for fixing the allowable rate of return at 6%, a brief consideration of the evidence will suffice to show the principal questions are factual in nature and that no rule of law had been violated.
A tract of which claimant's property formed a part had been dedicated to use as a cemetery since 1897. The area appropriated was part of about 28 acres which since 1942 had been operated by claimant, Diocese of Buffalo, as the Gate of Heaven Cemetery. The cemetery was bordered on the north and south *46 by two other cemeteries. The cemetery to the north is known as Holy Trinity; the cemetery to the south, Riverdale Cemetery. Holy Trinity and Riverdale border on Lewiston Road to the west. Claimant's cemetery does not, but has access to Lewiston Road by an easement through Riverdale Cemetery. All three extended on the east to Military Road. The portion of claimant's cemetery appropriated was the easternmost part bordering on Military Road.
Even if we leave aside for the moment the question of when the appropriated land might be utilized for cemetery purposes, the fact remains that these parcels, virtually surrounded by cemetery land, would certainly have no market for residential purposes. As to when the appropriated land would be utilized, a witness for the claimant testified and the trial court found that it was the intent of the claimant to develop the tract from Military Road and that "plans for the development of the appropriated area were initiated in 1954." During the trial it was shown that Holy Trinity, bordering Gate of Heaven on the north, had developed an area and sold graves on the westerly end and in the middle and had then opened an entrance on the east at Military Road and had developed this area before the rest of the cemetery was sold out. This finding effectively disposes of the respondents' assumption that the appropriated area would be used up last.
As to the method used to compute net income from the sale of graves, a witness for the respondent Power Authority testified that graves had been laid out at the rate of 996 graves to the acre. Therefore, he concluded the appropriated parcel of .942 acres would accommodate 938 graves which would be lost by reason of the taking. This was found by the trial court and affirmed by the Appellate Division.
In addition evidence was adduced as to the gross sales price per grave, the expense of sale, the cost of development of the cemetery land per acre and the cost of maintenance per acre. Based on this evidence the Court of Claims made findings which have been affirmed. The Court of Claims, respondent now asserts, neglected to deduct a $3,977 development cost at the beginning of the 61-year period, to consider interest on $13,175 in maintenance costs and the full cost of "perpetual maintenance." The answer to these assertions (as respondents concede *47 in their brief) is that it is not a normal cemetery management practice to develop all of the undeveloped areas at once. Thus funding such an expense is not necessary. This is equally true of the care fund. Such a fund does not necessarily have to be set up at the very beginning of the 61-year period. Indeed the expert for the Power Authority followed the same method as the Court of Claims. He took the gross proceeds from the sales of graves in the appropriated area and deducted the cost of development and perpetual care. Lastly the deduction for the care fund is adequate as it meets the obligation of this cemetery under the cemetery law then in effect. The respondents would have this court impose an obligation on this cemetery in regard to care from which the Legislature has specifically exempted it.
Turning to the so-called "Inwood" factor we do not think a further modification is warranted. Here the court has stated an Inwood coefficient different from that given by the experts. The expert for the claimant said the percentage should be 3½%. Witnesses for the State and the Authority said it should be between 12% and 15%. The Court of Claims selected 4%. The Appellate Division modified by using an Inwood coefficient of 6%. The decision as to what rate would be sufficient to arrive at the full and fair damage award is for the trial court or the Appellate Division, not the expert witnesses. (St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, 41.) The Appellate Division, after considering the experts' recommendations on the rate of return, thought that the claimant could prudently invest at 6%. There is no doubt that beyond 6% an investment would tend to be less conservative. In the quest for the "highest and best use" value there is merit in the argument that, where property of a well-established cemetery with steady patronage has been appropriated, the loss is in fact greater than that in the case of a new cemetery and the cemetery owners are to be compensated accordingly. A new or commercial cemetery has a selling force and advertising program. Gate of Heaven Cemetery operated with no sales force and no selling program. Hence there were sufficient reasons for the Appellate Division to adopt an Inwood coefficient of 6%, and we perceive no reason to upset this finding.
In arriving at the value the courts below have considered all the testimony given by the witnesses and have not applied any *48 erroneous principles of law. It would at the least be speculative for us to impose our own views of economics in place of those adopted by the Appellate Division and we do not think we should do so.
The orders of the Appellate Division should be affirmed, without costs.
VAN VOORHIS, J. (dissenting).
These two appeals, by the State of New York and its Power Authority, arise from the appropriation in 1958 of .942 acre for the Power Authority's Niagara project and of .652 acre in 1960 by the State for highway purposes. These two parcels, adjoining each other and consisting of 1.59 acres combined, are on the west side of a country road (known as Military Road) in an undeveloped portion of a cemetery known as Gate of Heaven Cemetery. At the eastern extremity, these damage parcels are far removed from existing graves which are located entirely in the western and middle sections. No landscaping, lawns, water pipes, roads or drainage conduits have been installed on or near the subject parcels. The future cost of developing them has been found to be $6,687. It is farm land included within the property lines of a cemetery.
The Appellate Division found the value of this 1.59 acres of vacant land to be $25,021 plus $5,000 consequential damages, exclusive of interest. The Appellate Division reduced the Court of Claims awards to these amounts by increasing the so-called Inwood coefficient from 4% to 6% in applying the valuation formula approved in St. Agnes Cemetery v. State of New York (3 N Y 2d 37) and followed in Mt. Hope Cemetery Assn. v. State of New York (11 A D 2d 303, affd. 10 N Y 2d 752). In my view the Inwood coefficient was required by the undisputed evidence to be at least 8%. For other reasons, also, these awards are grossly excessive. The areas involved are small, but the principle of decision and its repercussions are great upon the condemnation of cemetery properties throughout the State.
The St. Agnes formula calls for an estimate of the probable gross receipts from the sale of all of the plots in the cemetery, from which are deducted the estimated development, sales and maintenance costs. The proceeds of sale would not be realized at once, since in the ordinary course of business the cemetery would not be sold out for many years. To compute the condemnation awards it is, therefore, necessary to determine the *49 present values of the subject parcels (as of the dates of appropriation). Consequently the estimated aggregate net proceeds from the unsold parts of the cemetery, which are assumed to be receivable in equal annual installments over the remaining life of the cemetery  in this instance within 61 and 55 years from the appropriation dates  have to be discounted to determine the present value. The discount is made by using what are known as Inwood tables which, by quick reference, enable the determination of the present value of future annual installment payments over stated periods of years at different interest rates. The lower the Inwood coefficient (rate of interest) the greater becomes the present value. That percentage is to be adopted which most nearly reflects the investment risk.
The St. Agnes formula was not followed by Mr. Percival V. Bowen, who was the sole real property expert witness for claimant, in that he refused to measure or consider any investment risk in order to determine the Inwood percentage. He testified that it was not a cemetery enterprise, since it was owned by a nonprofit corporation, and, therefore, in determining the Inwood coefficient he refused to be governed by this criterion which is an integral part of the St. Agnes formula of valuation. He gave  and his cross-examination demonstrated that he could give  no reason for selecting one Inwood percentage rather than another. He simply drew in from the air a percentage which would produce the maximum awards for his client.
The size of the Inwood coefficient to be adopted is a subject for expert testimony, and there is thus no opinion evidence in the record that the investment risk in this instance calls for less than an Inwood coefficient of 8%. Witnesses for the State and the Authority placed the figure at between 12% and 15%, and Mr. Bowen  the only expert testifying for the claimant  conceded that it would be at a minimum of 8% if the cemetery were operated for profit, but he said that "we are not trying here to determine the value of a cemetery enterprise. We are trying to determine the value of a piece of land being taken from a church, non-profit cemetery." He said that in the main he agreed with the book by Julius Finkel, a recognized authority on appraising cemeteries, but that he disagreed with Finkel's statement that the accepted method for establishing the value of an existing profit or nonprofit cemetery is the same. He *50 recognized that if it were a profit cemetery, the Inwood coefficient would be greater and the awards correspondingly less, and that the correct percentage would be not less than 8% and as high as 15% in some instances. As a nonprofit cemetery he said  for no discernible reason  that the percentage should be 3%. The valuation of the parcel taken by the State would be $3,334 less and the Authority's parcel $2,605 less under the St. Agnes formula, if an Inwood coefficient of 8% were employed instead of the 6% applied by the Appellate Division. Correction of other errors would, in my judgment, result in further reductions. But before considering these other errors, it is necessary to point out that the idea is totally inadmissible in a court of law that the value of a cemetery in condemnation proceedings depends upon the kind of organization to which it belongs. In either case it is the same cemetery. If a cemetery were conducted as a profit-making venture, then, according to witness Bowen, it would be worth materially less than though it were nonprofit even though it were in the same location and physically in the same condition. If it were afterwards conveyed to a non-profit organization, according to this reasoning, the mere delivery of the deed would enormously increase its value. No rational theory of valuation admits of such a transformation. A cemetery, like most other property, derives its pecuniary value from what it is, not from who owns it. Distinctions of that kind are particularly untenable where the State or a public corporation is compelled to pay more than otherwise for the reason that the recipient is a religious organization, or is owned by one rather than by another constituent of a particular religious denomination.
These basic principles are violated by what has happened here.
The State or the Authority has appropriated parts of three adjoining cemeteries. Claimant (Gate of Heaven), owned by the Diocese of Buffalo, is bounded on the north by Holy Trinity Cemetery (owned by a Roman Catholic parish church) and on the south by a nonsectarian cemetery known as Riverdale. All three of these cemeteries abut on the east the road known as Military Road. The parcels here in suit, owned by the Diocese of Buffalo, have been valued at $16,500 per acre and $15,000 plus consequential damage. Adjacent land to the north, owned by the parish church of Holy Trinity, likewise fronting on Military *51 Road, was valued at $5,000 per acre in another proceeding in the Court of Claims, and land in Riverdale Cemetery (also on Military Road) adjoining the subject parcels on the south, was valued at $5,250 per acre. The basis, it would appear, on which the diocese is to be paid at approximately three times the rate per acre as the parish church of the same denomination, is that Gate of Heaven Cemetery is provided with burials from 26 parishes in the Diocese of Buffalo whereas Holy Trinity Cemetery draws from a single parish church. This is not a permissible standard of valuation in eminent domain. Gate of Heaven Cemetery was formerly owned by two Roman Catholic parish churches (see Riverdale Cemetery Assn. of Niagara Falls v. St. Mary's R. C. Church Soc. (286 N.Y. 654, affg. 260 App. Div. 984). Did its undeveloped acres become worth three times as much by being deeded to the Diocese of Buffalo in 1946? Or, if Holy Trinity Cemetery were to have been transferred to the Diocese and Gate of Heaven to Holy Trinity Church, would that have rendered Gate of Heaven's land of the same value per acre as was awarded to Holy Trinity in 1965? This illustrates the fallacy of appreciating the value of a diocesan cemetery because it can draw on numerous parishes for the burial of their dead. The unilateral act of the diocese in approving this cemetery for 26 of its parishes cannot increase the amount of money which it is entitled to be paid by the State or by the Power Authority. By its own directive the diocese could approve burial elsewhere, as it would have to do if the cemetery were entirely condemned or were filled. The canonical power to do that is not an element of secular or temporal value.
The expert opinion evidence of the witness Bowen, on which these awards depend, is built upon these fallacies. An expert witness' opinion has no more probative force than can be supported by the facts and rationale on which it is based (Matter of Kopec v. Buffalo Brake Beam, 304 N.Y. 65). If it is based upon a theory that has no support in law, or is contrary to law, the testimony lacks probative force. That is the case here. Mr. Bowen's conclusion is legally untenable that the land of a nonprofit cemetery is worth more than though the same land in the same condition were owned for gain; nor can it make any difference in court, as Mr. Bowen contended, that the profit which claimant seeks to make will inure to the benefit of a religious *52 society instead of private persons. Not only did he testify that the subject parcels were worth substantially more because they were owned for nonprofit purposes but, particularly, he said because "We are trying to determine the value of a piece of land being taken from a church". He stated that the award should be larger than otherwise because this is "consecrated" not merely "dedicated" land. He testified on cross-examination:
"Q. Could you tell me what the distinction is? A. Yes. Your dedicated land is assigned for the burial of people, but is not a proper place for burial for a good many of our religious denominations. The consecrated land is consecrated and, consequently, is the only place where the members of a great many of these religious organizations can be buried so far as their religious belief is concerned. You have a very different situation in a non-profit operation supported by people to whom the consecration of that cemetery makes the vital difference as to whether they can be buried there or not.
"Q. Would you say, then, that the land in a Presbyterian cemetery was consecrated or dedicated? A. Dedicated.
"Q. And in the Baptist cemetery? A. Is normally dedicated.
"Q. And what about the Jewish cemetery? A. Some of them are consecrated."
He drew a distinction between the values of Gate of Heaven and Riverdale Cemeteries by testifying that Roman Catholics are only buried in Riverdale if they get special dispensation because of interfaith marriages.
Asked whether there would be a willing buyer for this property under any circumstances, on redirect examination, Mr. Bowen testified: "It is possible that there might be a willing buyer if a group were assured of replacing or continuing the license with the Catholic Church operating as a Catholic cemetery".
The Inwood coefficient cannot vary according to whether it is a Roman Catholic cemetery or a Presbyterian, Baptist or Jewish. Neither can the same cemetery land be worth more or less under the law of eminent domain according to whether the capital gain arising from its condemnation goes to a religious corporation or to a membership corporation organized for the benefit of the members under article 9 of the Membership Corporations Law which is what a "profit" cemetery is.
*53 The Appellate Division, properly disregarding witness Bowen's bases for selecting an Inwood coefficient, and noting that he had testified that 8% would have been the return that "would be expected by a private investor in cemetery property", declined to adopt that figure not because it drew a distinction between profit and nonprofit cemeteries or between Roman Catholic, Baptist, Presbyterian or Jewish cemeteries, but for a new reason not adduced by witness Bowen or any one else, i.e., "because there was proof that over the past years some graves have been furnished by claimant to indigent parishioners without charge  thus", continued the Appellate Division, "the gross sales income used in calculating fair value of the land is somewhat less than it would be if in fact each grave had been sold."
The reason why that argument was not presented on claimant's behalf is evidently that unless the gross proceeds of sale were to be realized of all remaining potential grave sites (which both courts have found would be 996 per acre times $85.28) without giving any of them away, it would reduce the net proceeds to which any Inwood coefficient would be applied: in other words, the prospect of giving grave sites away instead of selling them would reduce the amounts of the awards. The record contains no evidence of how many grave sites have been given away in the past or how many are likely to be donated in the future. The awards are based on findings that they will all be sold at $85.28 apiece.
The Appellate Division appears to have used a 6% instead of an 8% Inwood coefficient, on this account, to reward the cemetery for being generous. Giving graves for indigents could have no tendency to make the unsold part of the cemetery more valuable. It would make it worth less, as an additional expense of marketing the graves by way of what in law would be termed paying for good will. If it had any effect at all it should have resulted in raising the Inwood percentage above the 8% which the Appellate Division recognized was the lowest figure conforming to the undisputed evidence. Neither court below nor claimant's expert witness gave any consideration, in fixing an Inwood factor, to the uncertainties over the next half century in wage rates and fluctuations in other maintenance costs, increasing resort to cremation or even to competition between cemeteries, *54 which the record shows to be likely in this area comprising four different cemeteries with large numbers of unsold plots in each. All of that has been completely disregarded, by claimant's expert witness on the ground that it is a nonprofit cemetery owned by a church, and by the Appellate Division on the ground that some of the grave sites are given away. These reasons are entirely without substance. The 8% rate required by the undisputed evidence should be adopted.
Other errors, as it seems to me, require setting aside these awards.
The 69-year history of Gate of Heaven Cemetery has shown a continuous course of development from west to east, and, if that is continued, at the rate of 230 grave sites sold per year which has been found to be the rate of sales, it will be about 50 years before the subject parcels are reached for grave sites and 19 years before even the western extremity of the undeveloped 9.586-acre parcel is reached on which claimant's 1.59 acres are located. That would mean that money would not be received by the cemetery from the sale of the subject parcels until after the lapse of many years, with the result that application of the St. Agnes formula would result in awards of less than the principal amounts of $7,200 against the Authority and $4,400 plus $5,000 against the State, which the record would sustain as valued for residential properties. There has been no attempt to develop these parcels out of their regular turn, but if the pattern of development established by 69 years of experience be deemed to have been reversed on account of a diagram prepared in anticipation of these proceedings, then the $6,687 found to be necessary to develop the subject parcels would need to be spent in the beginning. Grave sites cannot be sold in a country field. Roads, landscaping, drainage and water pipes are necessary to be installed, as has been done in the previously developed portions of the cemetery to the westward. The 1,587 grave sites proposed to be sold in the damage parcels, however, would not be sold at once, but are contemplated to be disposed of under the order on appeal proportionately with the rest of the cemetery over periods of 61 and 55 years respectively. No deduction has been made for the interest over these periods on the development expenses which would need to be spent in the beginning if the area were to be prepared for the immediate commencement of *55 sales therein. Accumulations of unreimbursed interest during the many years involved would amount to a substantial sum which has not been deducted in computing these awards.
The next point concerns the maintenance of the cemetery. This includes current maintenance and perpetual care after the graves have all been sold. The Court of Claims found that the proportionate cost of maintaining the Authority's damage parcel would be $527 a year forever, and $359 in the case of the State's parcel. The Appellate Division utilized these figures. Taking the $527 for the Authority's parcel, for example, it was found that $13,175 would be needed to earn $527 per annum at 4% interest, with the consequence that $13,175 was deducted from the anticipated gross receipts from sales in arriving at the projected net receipts. Nothing further was set aside for either current maintenance or perpetual care. Section 86-a of the Membership Corporations Law requires cemetery corporations generally to "establish and maintain (a) a permanent maintenance fund; and (b) a current maintenance fund", for the establishment of which "At the time of making a sale of a lot, plot or part thereof, the cemetery corporation shall deposit not less than ten per centum of the gross proceeds of the sale into the permanent maintenance fund. An additional fifteen per centum of the gross proceeds of the sale shall be depositied in the current maintenance fund." It is provided that the current maintenance fund shall be used and applied for the sole purpose of ordinary and necessary expenses of the care and maintenance of the cemetery, and that, when all burial rights in the cemetery have been conveyed, the fund remaining on deposit or to the credit of the current maintenance fund is to be transferred into the permanent maintenance fund.
If this statutory mandate had been applied in computing the estimated aggregate net proceeds of sales, as it was in Mt. Hope Cemetery Assn. v. State of New York (supra), instead of setting aside $13,175 for both purposes, $22,500 would have been required in the case of the Authority's parcel, or more than 70% in excess of the amount set aside here by the Court of Claims and the Appellate Division. In the case of the State's parcel, $4,861 or 54% additional would have been required. The Court of Claims pointed out correctly that section 71 of the Membership Corporations Law exempts cemeteries owned by a religious *56 corporation from these statutory requirements, but they are an indication of what the Legislature considered to be appropriate and necessary for adequate current maintenance and perpetual care, and the fact that a cemetery may be allowed by law to become rundown is not a factor adding to its value. This cemetery contracts with purchasers of graves to supply perpetual maintenance, and those portions of the cemetery are supposed to be currently maintained while in process of development, and, although the exemption precludes the trustees of a religious cemetery from being prosecuted for misapplication of trust funds if section 86-a be not followed, it is not a consequence that it adds to the value of a cemetery in condemnation if insufficient funds are allocated for current or perpetual care. It seems to be admitted that not enough money has been set aside for a perpetual care fund to carry out the cemetery's contractual obligations to previous purchasers of graves, and that it will be necessary to resort to a substantial part of the proceeds of future sales in order to compensate for these deficiencies. The Court of Claims said correctly that this should not depreciate the value of the real property in the unsold portions of the cemetery, but it does not justify continuing the practice nor augment the value of unsold portions by neglecting to deduct the proportionate amounts rightfully to be charged against unsold graves for their own current and perpetual care. Of course attempting to forecast in dollars and cents, as the Court of Claims and the Appellate Division have done, the cost of maintenance into the dateless future is one of the speculative elements, the incalculable nature of which the Legislature sought to reduce by setting aside a percentage of proceeds of sales instead of fixed amounts as has been done here. In setting aside a fixed sum in each case, required to produce at 4% the amounts heretofore expended for maintenance, the courts below have, in effect, eliminated from their computations any deduction for current maintenance, inasmuch as these capitalized sums would not be collected until the expiration of the 55- and 61-year periods, respectively, after which the income from them would be utilized for perpetual care. Claimant would be entitled to be credited with interest on the accumulated installments paid during the intervening years, but this would be much less than enough to compensate for omitting deduction for current maintenance as the comparisons hereinbefore *57 made with the Mt. Hope Cemetery case and the application of section 86-a of the Membership Corporations Law demonstrate. The difference in value is not minimal but substantial.
The orders appealed from should be reversed, and both proceedings remitted to the Court of Claims to make the correct computations in accordance with the principles above stated. If these computations result in lesser awards than $7,200 against the Authority and $4,400 plus $5,000 against the State in addition to interest, those amounts should be awarded as is indicated by the undisputed evidence to represent the values for residential purposes.
In each case: Order affirmed.